## ROSS et al. v. HOUSTON OIL FIELDS ASS'N et al.

### No. 10103.

Court of Civil Appeals of Texas. Galveston.

Oct. 18, 1935.

Rehearing Denied Dec. 12, 1935.

C. B. Masterson and Rucks & Enlow, all of Angleton, for appellants.

J. E. Price, H. Fletcher Brown, and Walter F. Brown, all of Houston, for appellees.

GRAVES, Justice.

This suit involves the title to approximately 126 acres of land in section 91 of A. C. H. & B. survey in Brazoria county, the common source of claims between the parties being J. H. Burnett, the appellants

claiming as Burnett's sole heir and her assignee, respectively, and the appellees as remote vendees down under a deed to Fontaine & Beers that Burnett acknowledged April 8 of 1893.

The trial having been without a jury, the court held the title to be in the appellees—both under the Burnett deed construed as having conveyed out of him to Fontaine & Beers all of section 91, and under the ten and twenty-five years statutes of limitation—filing these findings of fact and conclusions of law in support of the judgment:

"Findings of Fact.

"The two Little Surveys are the oldest surveys in the northwest part of Brazoria County. The H. N. Little ⅓ League was surveyed April 24, 1838, and granted July 18, 1845. The Erastus Little ⅓ League was surveyed April 24, 1838, and granted July 18, 1846. These two surveys each form a square. The H. N. Little adjoins the Erastus Little on the southeast with common or continuing north and south lines. The original surveyor's field notes and the field notes in the grants from the State describe the north line of the two Little surveys as running N. 48 deg. W. and the south line S. 48 deg. E. and the west line as running S. 42 deg. W. and the east line N. 42 deg. E. All the lines of the two Little Surveys, and particularly their north line have for more than thirty years been well marked on the ground and universally recognized and are not in dispute in this suit.

"The Thomas Spraggin Survey, a much larger survey than either the Little Surveys adjoins the H. N. Little on the south and is now, has been for more than thirty years, and is so shown on all maps, including the General Land Office map, shown as having a north line running N. 48 deg. W. and a south line running S. 48 deg. E. and a west line running S. 42 deg. W. and an east line running N. 42 deg. E. the same as the Little Surveys. The several surveys lying south and east of the Spraggins all have lines running in the same direction. The surveys coming down from Clear Creek on the north toward the Little Surveys are known as the H. T. & B. R. R. Surveys and were all surveyed by the same surveyor on March 8, 1859. These surveys are in perfect squares running due east and west and due north and south. Survey No. 23, H. T. & B., patented May 26, 1868, conflicts slightly at its southwest corner with the Erastus Little. Survey No. 24, H. T. & B., patented January 9, 1902, adjoins Survey No. 23 on the east. The way the two Little Surveys and Surveys Nos. 23 and 24, H. T. & B., are laid out on the ground leaves a triangular strip of land bounded on the south by the two Little Surveys and on the north by said Sections 23 and 24, H. T. & B., and on the east by the Spraggin-H. T. & B. Section 33 and the Hennel Stevens survey. It was this triangular piece of land which was surveyed and patented to J. H. Burnett as Section 91, A. C. H. & B.

"The original surveyor's field notes, as well as the field notes in the patent to Burnett, described Section 91 as follows:

"'Beginning at the N. E. corner of H. N. Little ⅓ League Survey on the upper line of T. Spraggin Survey:

"'Thence N. 48 deg. W. with the N. line of H. N. Little and E. Little 3375 varas to W. Line of Survey No. 23, H. T. & B.;

"'Thence E. 2885 varas with lower line of 23 and 24 to stake on S. Line of 24;

"'Thence S. 1403 varas to stake in prairie;

"'Thence east 24 varas to N. W. corner of No. 33, H. T. & B.;

"'Thence S. 42 deg. W. 599 varas with upper line of said Spraggin tract to place of beginning, containing 640 acres.'

"It is apparent, and I so find as a fact, that the original surveyor in surveying Section 91 did not take into account the conflict between Section 23, H. T. & B., with the Erastus Little and hence ran the south line of Section 91 too far to the northwest and, accordingly, his north line too far to the north; thereby creating a conflict with Sections 23 and 24. The field notes for Section 91 must be interpreted as running from the northeast corner of the H. N. Little along the north line of said Little Surveys to the south line of Section 23 and thence east along the south line of Sections 23 and 24 to a point opposite the stake called for in the original field notes of Section 91 as its northeast corner. According to the original field notes of Section 91, said section conflicted with Section 23 78.3 acres and with Section 24, 45.2 acres, making a total conflict of 123.5. This reduced the acreage of Section 91, as originally patented, to approximately 516.5 acres. Section 91, however, seems to have been regarded by Burnett up to the time he parted with title thereto in September, 1892, as containing 640 acres.

"Sometime prior to September 10, 1892, Fontaine and Beers began negotiating with

Burnett for the purchase of Section 91. It seems that about the year 1892 one Barrow, a resident of Brazoria County, conceived the idea that the Little Surveys and the Spraggin and those to the south and east had all been surveyed by the original surveyors with north and south lines running N. 37½ deg. W. and S. 37½ deg. E., respectively. He seems to have converted one Stockwell, Assistant County Surveyor of Brazoria County at that time, to that view. Both Stockwell and Barrow wrote communications to the General Land Office about 1892, explaining why they held that view, and endeavored to get the General Land Office to recognize and adopt their position. They contended that the variation between the magnetic and the true north at the time the surveys were originally made was 9½ deg. E. and that the original surveyor or surveyors showed this fact on their original field notes and stated that the surveys were made at the magnetic variation of 9½ deg. E. They argued to the Land Office that said Office had misinterpreted the field notes of the original surveyor and had patented the land at N. 48 deg. W. instead of N. 37½ deg. W. The Land Office, however, refused to recognize Barrow's and Stockwell's contention and adhered to a line N. 48 deg. W. I also find that the residents of Brazoria County in and about said Surveys also refused to adopt Barrow's and Stockwell's contention.

"It appears from the evidence that Fontaine and Beers employed Stockwell to survey Section 91 incident to their purchase thereof from Burnett. Stockwell furnished the field notes that went into the deed from Burnett to Fontaine, which read as follows:

" 'All that certain tract or parcel of land situated in Brazoria County, Texas, and known and described as Section 91, A. C. H. & B. Survey, Patent No. 188, Vol. 26, patented to Burnett and Kilpatrick, and described by metes and bounds as follows:

" 'Beginning at a point on the upper line of T. Spraggin Survey 597.5 varas from his north corner, thence N. 37½ deg. W. 2808 varas along the N. E. Line of the H. N. Little to corner;

" 'Thence E. 2212.7 varas to corner on the south line of 24, H. T. & B.;

" 'Thence south with the east (west) line of H. Stevens Survey 1444 varas to upper line of 33 H. T. B.;

" 'Thence W. 24 varas to its N. W. corner;

" 'Thence S. 51 deg. 12' W. 597.5 varas to place of beginning, containing 514.16 acres.'

"Since 1892 neither J. H. Burnett nor anyone in his behalf nor his estate nor any of his heirs have ever assessed for taxes any of the land in Section 91. A. C. H. & B., Brazoria County, Texas. Burnett died in 1902, and the inventory of his estate does not show any land in Section 91. Burnett did, however, assess regularly after 1892, and his estate after his death, other lands located in Brazoria County. The inventory of his estate, which shows other lands in Brazoria County, contained the customary oath to the effect that it showed all the lands owned or claimed by said estate.

"Plaintiff, Ellen B. Ross, daughter and sole heir of J. H. Burnett, neither believed nor contended that any portion of Section 91 was reserved by her father until shortly before the filing of this suit, when the defendant Frank Stevens, an abstractor of Brazoria County, Texas, informed Mrs. Ross of the possibility of such claim and took from her a power of attorney, coupled with a one-half interest, authorizing the institution of this suit.

"Within a few months after the conveyance to Fontaine and Beers they had Stockwell subdivide the land purchased by them from Burnett into four lots containing 128.54 acres each, or a total of 514.16 acres. This plat was promptly placed of record in Brazoria County and showed no vacant land between Section 91 and the two Little Surveys.

"Forthwith upon their acquisition of the land, Fontaine and Beers began assessing it in Brazoria County as containing 514.16 acres. Each year for about ten years the assessor listed 126 acres in this survey on the unknown rolls, evidently to make up the 640 acres. After about ten years, however, there appeared a notation on the rolls of Brazoria County, 'This is an error', and thereafter the assessment of 126 acres was dropped.

"On February 15, 1893, Fontaine deeded his interest in the land to Beers, and on May 26, 1909, Beers, by general warranty deed, conveyed Section 91 to Alex A. Sharp. Sharp conveyed the land in 1912 to Allison, and in December, 1912, Allison conveyed the land to the Allison Richey Gulf Coast Home Co.

"Most of the land (explained below) was taken back by Sharp through trustee's deed in 1917 and was shortly thereafter purchased again by Allison individually

from Sharp. Allison deeded to Houston Oil Fields Assn., defendant herein, most of the land in controversy on March 15, 1917.

"In 1906, when the land was still owned by Beers, he leased all of Section 91 to T. W. House, Jr. House completely enclosed Section 91 in the year 1906 with a substantial fence sufficient to retain and exclude cattle of ordinary disposition, and used said land continuously, openly and notoriously for a cattle pasture as a tenant of said Beers. This use continued to the latter part of the year 1909.

"Shortly after Sharp purchased the land from Beers in May, 1909, he entered into a purchase contract with Allison, which was consummated in the deed to Allison in 1912. Allison, however, went into possession of the land in the latter part of 1909. Allison purchased approximately 70,000 acres of land in Brazoria County adjoining Section 91, with the object and purpose of subdividing said land and selling same as orange orchards through the Allison-Richey Gulf Coast Home Co., which, as aforesaid, was created in 1912. Allison employed a surveyor, to-wit, L. A. Gueringer, C. E., to subdivide and plat all of the land owned by Allison, including Section 91. Gueringer's work was completed in June, 1910, and a comprehensive map, generally known as the subdivision of the Allison-Richey Gulf Coast Home Co., was placed of record in Brazoria County. This map showed that Section 91 had been subdivided into forty-six lots ranging from 7 to 19 acres each and extending from the north line of the Little Surveys to the south line of Sections 23 and 24, H. T. & B. The Allison-Richey Co. went upon the ground in 1909 or 1910 and tore down most of the House fences and drove stakes for the corners of their numerous lots and graded a number of 60-foot roads on Section 91. They graded a road along the line between Section 91 and the Little Surveys. They graded another road along the east line of Section 91 and another road along the entire length of the north line of Section 91. They also graded four roads across Section 91 from the South line of Sections 23 and 24 to the Little Surveys.

"I find as a fact that the Allison-Richey Co. was a large and energetic operator who extensively advertised their subdivision, including Section 91, and brought thousands of prospects from the North and East to view the land; that from about 1912 until about 1916 this promotion flourished, during which years the Allison-

Richey Co. had numerous employees, and thousands of prospects looking over the lots located on Section 91; and that it was generally known throughout Brazoria County that the Allison-Richey Co. was claiming all of Section 91, had subdivided it as aforesaid, and was selling lots out of Section 91.

"According to the Allison-Richey subdivision the following lots lay in the strip of land claimed by the plaintiffs in this suit, to-wit: Lots 1, 2, 3, 5, 6, 10, 11, 17, 18 and parts of 36, 35, 26, 24, 16, 15, 9, 8 and 4. Allison-Richey sold Lot 2 to Harry McAuley on February 19, 1910. They also sold Lot 4 on February 21, 1910, and Lot 34 on February 24, 1910. They sold Lot No. 14 on December 24, 1909, and on September 27, 1913, they sold Lot No. 3 to Gertrude Leider and leased Mrs. Leider Lot No. 1. These two lots formed the northwestern extremity of the disputed strip and adjoined the Erastus Little Survey. Mrs. Leider went into possession of Lot No. 3 in 1913 under her said purchase and erected a home thereon and has continuously occupied and claimed Lot No. 3 to this date. The evidence is uncertain as to how long Mrs. Leider had Lot No. 1 under lease, but I find as a fact that she did fence Lot No. 1 and used same exclusively and maintained a fence thereon for several years after 1913. She, however, was not claiming possession or use for herself or as agent or tenant for the defendants or their predecessors in title of any land in Section 91 other than Lots 3 and 1. Plaintiffs, however, are not attempting in this suit to recover from Mrs. Leider.

"After the Allison-Richey Co. 'blew up' and the remaining land went back to Sharp and then to Allison individually, Allison leased a great part of his land, including the east part of Section 91, together with other lands, into a large pasture for grazing purposes, which pasture was well and universally known as the Bassett Blakely pasture, and contained much less than 5,000 acres, and Blakely continued to use same until Massey took it over in 1923. Blakely maintained at all times a good and substantial fence sufficient to exclude and retain cattle of ordinary disposition.

"In the year 1918 Houston Oil Fields Association, by verbal lease, leased to C. W. Massey all land owned by it in Section 91, who enclosed the western part of Section 91 with a good and substantial fence sufficient to exclude and retain cattle of ordinary disposition, and used same, claim-

ing it as a tenant of Allison, and later the Houston Oil Fields Assn. continuously from 1918 to this date, in later years subleasing it to other parties. This latter mentioned pasture has, since 1918, been generally and universally known and recognized as the Massey Pasture. About the year 1922 Massey acquired rights to the Blakely pasture and took down the dividing fence on Section 91 between the Blakely pasture and the Massey pasture.

"I find as a fact that the Massey pasture at no time contained more than 5,000 acres, and I also find as a fact that at no time was Section 91 or the land sued for completely surrounded with other lands claimed by Massey or Blakely or by their lessors.

"I find as a fact that during the big blizzard of December, 1924, Massey's cattle broke through the fence at the southeast end of his pasture and that said fence remained down and several gates into said pasture were permitted to remain open for a period of approximately twelve months after December, 1924. I find, however, that during the spring of 1926 the Massey pasture fence was again restored to a substantial condition and the gates kept closed, which condition has obtained to the present time.

"During this 12-month period when the fence was not kept in good condition I find that the cattlemen generally in Brazoria County were in a state of discouragement and that most cattlemen were slow in repairing their fences, as was Massey. During this period, however, the fence posts remained standing, and there was sufficient fence left to apprise anyone that the pasture had not been abandoned.

"I also find as a fact that in April, 1919, the Houston Oil Fields Assn. granted a right-of-way deed across the disputed strip to the Texas Pipe Line Co. for a pipe-line, which pipe-line was shortly thereafter built. I also find that they thereafter granted another right-of-way deed across the disputed strip to the Houston Natural Gas Co., both of which right-of-way deeds were promptly placed of record in Brazoria County.

"All taxes on the land in controversy have been paid by the Houston Oil Fields Assn., but were not currently paid until the last year or so.

## "Conclusions of Law.

"I, therefore, find and conclude as a matter of fact and law that, regardless of whether the dividing line between Section 91 and the Little Surveys runs N. 48 deg. W. or N. 37½ deg. W., the real purpose and intent of J. H. Burnett was to sell, and of Fontaine and Beers to purchase, all of Section 91, A. C. H. & B., as same was patented by the State to Burnett and Kilpatrick and that Burnett did not intend, and during his lifetime never believed, that he had reserved from said deed to Fontaine and Beers any part of said Section 91. I conclude as a matter of law that all of said Section 91 as so patented to J. H. Burnett passed from him to Fontaine and Beers under said deed and that said deed must necessarily be so construed.

"I also find and conclude as a matter of fact and law that the Houston Oil Fields. Assn. and those under whom they claim have had and held under deeds duly registered in a regular chain of title from the sovereignty of the soil, peaceable and adverse possession to the land in controversy, using and enjoying the same for a period of longer than ten years, also for a period of longer than twenty-five years, prior to the institution of this suit. In making this finding and conclusion the Court is of. the opinion that if it could be held that the 12-month period following December, 1924, when the fence was neglected, interrupted the use and enjoyment of the land as a pasture, beginning with Massey in 1918, still the claim, use and enjoyment of Allison-Richey Co., as aforesaid, following immediately upon House's use and enjoyment of the land, and continuing the Blakely's. and Massey's use and enjoyment of the land commencing in 1918, was so open and notorious as to constitute clear notice to all the world 'that all of Section 91 was being held adversely to the heirs of J. H. Burnett; in other words, from the time House fenced the land in 1906 to the present time no one visiting Section 91 could help but be apprised that it was being claimed, used and enjoyed openly and adversely to all the world.

"To all of which findings and conclusions all the parties except.

"C. G. Dibrell, Judge Presiding." .

Through a number of subjoined propositions appellants in this court inveigh against the judgment below under five assignments, the first two to the effect that it was error to construe Burnett's deed to Fontaine and Beers as conveying all of section 91 as patented to him, for two reasons:

(1) Since the deed contained, first, a general description, and, second, a definitely particular one of the land intended to be

conveyed, the latter being accordingly controlling and not having included within it the land herein sued for.

(2) Since the undisputed testimony showed that Burnett did not intend through that deed to sell, nor did Fontaine and Beers intend to buy, the whole of such section 91.

The other three assignments assail the stated findings upon limitation under these contentions:

(1) Not only were the appellees in no position to deraign title from the sovereignty of the soil because the deed from Burnett to Fontaine and Beers did not by its description include the land in controversy, but, further, the evidence as well as the stated findings of the court, were wholly insufficient to prove that the appellees and their predecessors in title had had any such continuous possession of the land as the statute requires for either the ten or twenty-five years' period.

(2) Because the undisputed evidence shows that there was a continuous break in the appellees' possession from about 1909, when the Allison-Richey Company tore down the House fences on the land, up until 1918, when Massey fenced his pasture around it, during all of which time there was neither any fences around nor any cultivation, use, nor enjoyment of the land by any one, no other assertion of right thereto during that nine years being asserted by any one except the subdivision, grading, and selling of lots out of the same by the Allison-Richey Company, all of which facts being clearly shown in the trial court's findings themselves.

(3) Because, and contrary to the court's otherwise stated conclusions of fact upon that phase of the limitation question, the undisputed evidence shows that there was a complete and fatal break in the appellees' possession of the land from about December of 1924 to the spring of 1926, that is for 15 months, when Massey left his gates and fences so completely and continuously down, especially on the south or southwest side of his pasture, that during all that time no barrier whatever against the passage of cattle, riders, or persons traveling by automobile over this land existed, and no reason whatever was shown by the appellees for this long delay in restoring and rebuilding of the Massey pasture's gates and fences, it consequently further appearing that the shown delay of about 15 months in the repairing thereof was a wholly unreasonable lapse of time.

■ This court can find no fault with the conclusions of the learned trial court either of fact or law; in so far as they are those of fact, since all the assignments presented against them are that they are not supported by the evidence, or that the undisputed evidence shows otherwise, this tribunal cannot, indeed, consider any question as to whether the weight of the evidence is for or against them [Ætna Life Ins. Co. v. Gilley (Tex.Civ.App.) 41 S.W.(2d) 1046; Hall Music Co. v. Robertson, 117 Tex. 261, 1 S.W.(2d) 857; Shaw v. Centerfield Oil Co. (Tex.Civ.App.) 10 S.W.(2d) 144; Luker v. Anderson (Tex.Civ.App.) 10 S.W.(2d) 149; First National Bank v. Ervin (Tex.Civ.App.) 12 S.W.(2d) 269], but must disregard all evidence adverse to the findings and consider only that favorable to them, indulging every legitimate conclusion therefrom which tends to uphold them. Texas Utilities Co. v. West (Tex.Civ.App.) 59 S.W.(2d) 459; Massoud v. Attel (Tex. Civ.App.) 32 S.W.(2d) 225; Parkey v. Lawrence (Tex.Civ.App.) 284 S.W. 283; Easterling v. Simmons (Tex.Civ.App.) 293 S.W. 690; Farmers' Gin Co. v. Smith (Tex. Civ.App.) 28 S.W.(2d) 839; Kuykendall v. Johnson Funeral Parlor (Tex.Civ.App.) 38 S.W.(2d) 601, 602; Texas Employers' Ins. Ass'n v. Sloan (Tex.Civ.App.) 36 S.W. (2d) 319; Johnson v. Weed (Tex.Civ.App.) 52 S.W.(2d) 917; Texas & Pacific Ry. Co. v. Gillette (Tex.Civ.App.) 50 S.W.(2d) 901; Guthrie v. Country Club Estates Co. (Tex.Civ.App.) 46 S.W.(2d) 746; San Antonio Machine & Supply Co. v. Central Texas Power & Transmission Co. (Tex.Civ.App.) 295 S.W. 229; Fort Worth Mutual Ben. Ass'n v. Jennings (Tex.Civ. App.) 283 S.W. 910; Dallas Ry. Co. v. Hallum (Tex.Civ.App.) 276 S.W. 460; Margules v. Terry (Tex.Civ.App.) 273 S. W. 690.

When these rules are applied, it is clear that all the controlling findings made below must be also adopted here as having been amply sustained by the evidence, inclusive of those to the effect that the Burnett deed conveyed all of section 91 as patented to him, that, regardless of whether the dividing line between section 91 and the two Little surveys runs north 48 degrees west or north 37½ degrees west, the real intent of the parties to that deed was to thereby so pass from the one to the other all of section 91, and that the appellees had acquired title to the tract sued for under both the 10 and 25 years' statutes of limitation.

Not only is there plenty of evidence to sustain the conclusions just stated, consonant with the cited two rules of law under which it is arrived at, but an inspection of the Burnett deed discloses upon its face that the particular description therein contains two conflicting calls and is in consequence subject to two constructions, one in harmony with the preceding general description and the other antagonistic thereto, that is, one of these purports to describe the land by calls for the adjoining surveys, while the other undertakes to do so by course and distance specifications; if the course and distance calls be eliminated and those for the adjoining surveys be used, in substance there is a complete description reading as follows:

"Beginning at a point on the upper line of the T. Spraggins Survey;

"Thence along the northeast line of the H. N. Little Survey to corner; and thence east to corner on the south line of 24 H. T. & B.;

"Thence south with the east (west) line of H. Stevens Survey to upper line of 33 H. T. & B.; thence west to its N. W. corner; thence south to north corner of the said Spraggins; thence to the place of beginning."

If, however, calls for adjoining surveys be disregarded and only the course and distance calls are retained, the land is thus comprehended:

"Beginning at a point on the upper line of the T. Spraggins Survey 597.5 varas from his north corner; thence N. 37½ deg. W. 2808.8 varas; thence east 2212.7 varas; thence south 1444 varas; thence west 24 varas; thence south 410 varas; thence south 51 deg. 12' west 597.5 varas to the place of beginning."

The first of these particular descriptions, obviously being in complete accord with the foregoing general one, was correctly adopted by the trial court, in conformity to the well-established principles of law that a general description is not to be disregarded where it can be harmonized with the particular one (14 Texas Jur., par. 249, p. 1041; Scheller v. Groesbeck [Tex.Com. App.] 231 S.W. 1092, 1093), and that "where there is a conflict between a specific description by metes and bounds and the lot and block number by which a tract of land is conveyed, the latter description will usually prevail. Arambula v. Sullivan, 80 Tex. 615, 16 S.W. 436, 437; Masterson v. Munro, 105 Cal. 431, 38 P. 1106, 45 Am. St.Rep. 57; Moore v. Minneapolis & St.

P. S. Ry. Co., 129 Minn. 237, 152 N.W. 405; Nash v. Wilmington & W. Ry. Co., 67 N.C. 413; Cook v. Hensler, 57 Wash. 392, 107 P. 178; O'Herrin v. Brooks, 67 Miss. 266, 6 So. 844; R.C.L., vol. 8, p. 1082, § 137; Devlin on Deeds, § 1038A." Rio Bravo Oil Co. v. Weed (Tex.Civ.App.) 300 S.W. 171; Id., 121 Tex. 427, 50 S.W. (2d) 1080, 1089, 85 A.L.R. 391.

In combating the applicability of these principles and authorities, and in doing so apparently advancing to the heart of their case, the appellants lay down this proposition: "Where the field notes in a deed contain a call for course and distance which apparently conflicts with a call for an unmarked survey line, parol evidence is admissible to show that the field notes are the result of an actual survey and that the call for course and distance follows the actual footsteps of the surveyor on the ground, and to explain the apparent conflict in a call for the unmarked survey line; and, since the description in the deed of Burnett to Fontaine and Beers contains a call for course 'North 37-½ degrees West' * * * and 'along the North-east line of the H. N. Little Survey,' the patent field notes of said Little Survey running North 48 degrees West, thereby creating an apparent conflict in said calls, parol evidence is admissible to show the actual course traversed by the surveyor on the ground and to explain said apparent conflict in determining what land was intended to be conveyed by the deed." Citing such cases in support of it as Cullers v. Platt, 81 Tex. 258, 16 S.W. 1003; Stark v. Brown (Tex.Civ.App.) 210 S.W. 811 (writ of error dismissed); Whaley v. Lemmon (Tex. Civ.App.) 281 S.W. 321.

They then go further and urge with much earnestness that since Stockwell testified on this trial to having actually run along the north 37½ degrees west course in making the survey for and in drawing the field notes of the Burnett to Fontaine and Beers deed, that therefore, to quote their exact language, "the call accompanying it, that is 'along the Northeast line of the H. N. Little Survey' must give way, since the call for an unmarked line in the prairie, even though it be a survey line (or any other call for that matter) must be disregarded for it conflicts with and does not truly reflect the actual footsteps of the surveyor who made the survey, who shows beyond doubt and without dispute the actual line traversed by him, according to the course and distance set forth in the deed."

It may be conceded, in view of the evident fact, as stated supra, that the particular description here is ambiguous and susceptible of two different constructions, albeit one of them is in entire harmony with the preceding general description, that this parol testimony was admissible as tending to throw light upon what effect should in law be given that description in relation to its preceding general one, but it by no means follows either that this ambiguous specific description must take precedence over the general one under the rule applied in Cullers v. Platt, supra, or that Mr. Stockwell's testimony conclusively shows that the footsteps of the original surveyor in locating section 91 went along this north 37½ degrees west line that Stockwell so followed in making his surveys for this Burnett deed, for these among other reasons:

In the first place, the rule of law applied in Cullers v. Platt, supra, and perhaps all of the other cases so cited with it, is inapplicable here, because in them there was no ambiguity whatever in the particular description, while here both sides conceded and the face of the deed plainly shows that there was; indeed, in the Cullers v. Platt opinion itself the court distinguished that cause from this by saying that a general description may be looked to in aid of a particular one that is defective or doubtful.

In the second place, and again unlike the situations to which appellants' arguments apply, the conflicting call in this instance for the adjoiner, that is, "along the Northeast line of the H. N. Little," by the uncontroverted evidence and the findings of the trial court, was not for an unmarked, unlocated, prairie line, but, on the contrary, was the well-marked recognized east or northeast line of the H. N. Little survey that itself was one of the oldest surveys in that territory, all of which had coincident or parallel northwest and southeast lines the same as it did, and all of which were tied together with known marked and recognized locations on the ground, including the two Littles and the Thomas Spraggins.

In the third place, because Stockwell was shown to have had no warrant for starting merely at a stake some 1,250 feet down within the body of the Spraggin below its marked and recognized northeast corner for what he took to be the beginning corner of section 91, and thereby throwing it out of joint with all its adjoining surveys as called for in its quoted description, and in consequence bringing about conflicts between it and the H. Stevens and No. 33 H. T. & B. surveys toward the east and the Spraggin toward the south, for something like one-fourth of a mile in each instance, at the same time leaving large strips between it and the Little surveys toward the west, and sections 23 and 24 toward the north.

Wherefore, this court concludes that reversion must be had to the rule of law that the intent must be gathered from the whole description, including the general as well as the special, reading into it for that purpose all the instruments referred to in the chain of title to the tract involved, and that when that is done the call for the H. N. Little line in this instance must prevail. 7 T.J. 181; Briley v. Hay (Tex.Civ.App.) 13 S.W.(2d) 997; Wyatt v. Foster, 79 Tex. 413, 15 S.W. 679; Kirby Lumber Co. v. Gibbs Bros. & Co. (Tex.Com.App.) 14 S. W.(2d) 1013; Ruth v. Carter-Kelly Lumber Co. (Tex.Civ.App.) 286 S.W. 322, 326; Texas Co. v. Andrade (Tex.Civ.App.) 52 S. W.(2d) 1063; Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.(2d) 773; Anderson v. Schaefer (Tex.Civ.App.) 275 S. W. 300; Matador Land & Cattle Co. v. Cassidy-Southwestern Commission Co. (Tex.Civ.App.) 207 S.W. 430.

While it would unnecessarily extend the opinion to even recapitulate the evidence supporting the findings that the parties mutually intended none of section 91 as patented to be reserved from the Burnett-Fontaine and Beers deed, and that the appellees' had made out their claimed limitation title, these conclusions upon the effect of it as to each issue may be stated:

(1) Stockwell said he in advance showed Messrs. Fontaine and Beers, who had purchased the land and instructed him to locate its corners and report how many acres there were, the two theories as to the location of the northeast line of the Little "on the ground; and Mr. Fontaine decided that he wanted the field notes made up in such a way as to leave him entirely outside of any conflict"; that is, he must have taken them all to these corners as he contended they should be located, which, as elsewhere herein recited, not only failed to harmonize with the calls for and the recognized positions on the ground of any of the adjoining surveys, but were so out of joint with them as to leave such glaring apertures on two sides and such overlappings on the other three as reasonably to have deterred Mr. Fon-

taine (who was a lawyer) from accepting such a revolutionary theory, and to have led him to require instead that the field notes stick to the adjoiners as they then existed on the ground, especially as that would leave him practically the acreage he had bought, 514.16 acres, exclusive of the conflict found by the trial court to have existed on the north between this tract and railroad surveys 23 and 24; presumably, also, both Stockwell and Fontaine must have known of that pre-existing conflict, as the uncontroverted evidence shows that it had first appeared upon the county map of Brazoria county in 1891, at a time when Mr. Stockwell was deputy county surveyor of that county.

Furthermore, it likewise appears that all the immediate parties to that transaction ever thereafter treated it as having passed between them the title to all the land then in section 91, no one of them making a contrary claim.

■ (2) It is true the court found that Massey's fences were down in places at times and his gates were not always kept closed, especially as to the period from December of 1924 to the spring of 1926, but it further found, notwithstanding, upon amply supported testimony, that the land in controversy was continuously used by Massey in such a way as to make it clear to the world that he was using and claiming it adversely, that although some of the wires, posts, and gates were down occasionally and for about a year between the two dates given, still he persisted throughout that and all of the other times in question in maintaining his pasture thereon; under the constructions placed upon the statute by our courts, these findings were sufficient to sustain a plea of limitation. Moore v. McCown (Tex.Civ.App.) 20 S. W. 1112; Dunn v. Taylor, 102 Tex. 80, 113 S.W. 265.

Neither did it defeat the plea that Massey may have had some lands in his pasture that he did not have under lease, nor that he permitted some of the farmers to use it, in consideration of their permitting him to join their fences with him, as was held by the Supreme Court in Burnham v. Hardy Oil Co., 108 Tex. 555, 195 S.W. 1139.

Indeed, the court's finding that from the time House fenced this land in 1906 to the date of the trial no one visiting it could keep from being apprised that it was being claimed, used, and openly and adversely enjoyed against the world, seems not to have been attacked, except in so far as concerns the possession prior to Massey's lease in 1918; that being true, the finding remains conclusive as to such possession, use, and enjoyment from 1918 on until the trial, which itself was longer than ten years; in addition to that, it seems further clear from the evidence that appellants misconstrue the effect of the detailed acts of use, occupancy, and appropriation under the Allison-Richey tenure of this land; the statute characterizes adverse possession as "an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another"; so that, if there is an actual and visible appropriation, or a "flying of the flag," it is sufficient, a mere failure to keep up fences or keep the gates always shut not being sufficient to defeat limitation, where there has yet been such an actual and visible appropriation of the land; not only so, but the incidents of this statute would also seem to be made out by such use, occupancy, and visible appropriation of the land as the particular purpose it is being devoted to calls for; so, in this instance, during the Allison-Richey holding, the subdividing, surveying, marking, laying out, and surrounding of this tract with roads, and its exhaustive exploitation as such a subdivision by being constantly shown to thousands of prospective purchasers, would seem to have complied with these requirements.

These conclusions require an affirmance of the trial court's judgment; it has been accordingly so ordered.

Affirmed.

## On Motion for Rehearing.

In response to appellants' able and earnest motion for rehearing, the cause has been carefully reconsidered, but the court is constrained to adhere to the conclusions reached on original hearing; especially have the additional findings of the trial court appearing on pages 51 to 56, inclusive, been reconsidered, but nothing appears therein from which any of our former findings either of fact or of law should be changed.

Under the belief that the appeal was correctly decided before, the motion for rehearing will be overruled.

Overruled.