**FULTON, Plaintiff-Appellee, v. RAPP, Defendant-Appellant.**

Ohio Appeals, Second District, Madison County.

No. 174.   Decided November 14, 1950.

Sam Robison, Frank Murray, London, for appellee-Fulton.
Dale D. Rapp, Columbus, D. H. Jackman, London, for appellant-Rapp.

### OPINION

By THE COURT:

This is an appeal on questions of law from a judgment in favor of plaintiff-appellee on an action to enjoin defendant from interfering with plaintiff's use and possession of 4.32 acres of land described in the petition. Defendant answered

denying plaintiff's right to the relief sought and by cross-petition set up his claim of right of title by adverse possession and prayed that his title be quieted.

By stipulation and by evidence it appeared that the plaintiff held the record title to the land involved. The land was a triangular strip on the south side of Route 56 lying contiguous to a farm owned by the defendant whose predecessors in title were his father, C. P. Rapp, and before him, David Robison and his children. The farm of which the piece under consideration was a part was known since 1870 as the George Alkire land. Most of this farm land is on the north side of Route 56 and on the side of Deercreek opposite the triangular strip. In 1922, succeeding the death of George Alkire, the farm was deeded to his daughter, Catharine Lucas by the other children and heirs of George Alkire. Later, in June 1939, it was deeded by Catharine Lucas to Bruce Cochran and Catharine Cochran, his wife, and Homer Robison and wife; the Robisons deeded their share to the Cochrans and in September 1946 the Cochrans deeded the 4.32 acres to the plaintiff, Marvin M. Fulton.

The only issuable question presented to the trial judge for determination was upon the claim of the defendant that he held title to the land in controversy by adverse possession for 21 years.

The trial judge, in a written opinion with which we have been favored, based his judgment on the character and extent of defendant's use of the land involved and upon his failure to show that his possession was otherwise than permissive and found that his possession was not adverse and was subordinate to the legal title.

Numerous cases are cited by the trial judge and by counsel for the plaintiff to support the propositions of law upon which the judgment is predicated as to the soundness of which on the facts to which applied we take no exception. We will hereafter consider and discuss some of these cases.

The dominant question here is how to resolve the material disputed factual issues. The essential elements to support title by adverse possession are, that the possession be actual, open and notorious, hostile and under claim of right, continuous and exclusive and that in addition to these elements the possession continue for 21 years. There is no dispute in this record that the defendant and predecessors in title actually possessed the land in controversy for 21 years; that this possession was open, notorious and continuous. There is then left the questions whether or not this holding was exclusive, hostile and under claim of right. Certainly, if this use of the land was by permission of the owners of the title it could not

be adverse nor hostile. Manifestly, if it was used without such permission it was hostile within the intent of the law.

The use of the land which is requisite to adverse possession is such as would be made of such land by an owner thereof. It is said in Doctor v. Turner, 231 N. W. 119, a Texas case cited by the trial judge, that

"in order to make good claim of title by adverse holding the true owner must have actual knowledge of the hostile claim or the possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the right of the true owner is invaded intentionally and with a purpose to assert a claim of title adversely to his, or so patent that the owner could not be deceived, and such that if he remains in ignorance it is his own fault."

In this case there can be no doubt that the true owners had actual knowledge of the possession of the defendant of the land in controversy, nor, is there any dispute that for many years, more than 21, the defendant and predecessors had used the 4.32 acre piece for pasture land for their cattle, horses and mules, hogs and some sheep. Not all of the witnesses say that all of these kinds of animals were pastured, but all that speak on the subject do testify that they regularly pastured their stock on this land. This use was not occasional and sporadic but was regular and continuous and extended back many years more than 21 prior to the institution of the suit.

There was no fence on the property line between defendant and the 4.32 acre piece of the Alkire land and no witness (and some of them went back 50 years) ever knew it to be fenced. There was a fence in front along Route 56. Who placed it there does not definitely appear but it is conclusively shown that it was maintained, kept in repair and made to serve the added purpose of a hog fence by the defendant and his father, his predecessor in title. It further appears that none of plaintiff's predecessors in title had, during the years that defendant and his father occupied the land in controversy, used it for pasturage or for any other purpose whatever unless it might be as hunting ground, at times, and used a fenced lot which had been enclosed connecting farm scales, which lot was on the 4.32 acre piece. These scales and fences, the latter occupying a small part of the 4.32 acre piece were standing though pretty well down when defendant acquired his land and were torn down in 1920 or 1921 and the scales were removed by him about the year 1922.

There is some claim that stock from the Alkire land came across a way adjacent to and under the bridge over Deer-

creek and over and onto the triangular piece. Testimony was offered by two witnesses of such occurrences. The first instance by a fisherman, that he at one time saw some mules from the Alkire land run under the bridge and onto the 4.32 acre piece of land. The second, where some animals, by the same route, got onto the land in controversy. They were discovered by those who lived on the Alkire land and put back into their own pasture. There was some controversy whether or not ordinarily there was sufficient space or footing for animals to move from one farm to the other. Mrs. Lucas says the water was too deep to permit of such use and Frank Miller testifies that the water was within four feet of the bridge. The reasonable inference to be drawn from the record is that animals did not regularly so move nor was the opening intended for, or used as, entrance and exit for stock from one farm to the other.

It further appears that soon after he acquired his farm the defendant cut some timber, a few trees, off the 4.32 acre piece and sold it; that he had taken gravel therefrom and used it on the strip and elsewhere and had sold some; that he regularly cleaned fence rows and cut out underbrush; that he and his father maintained the driveway across the land and that he regularly used it to get to and from other parts of his farm. There is testimony that he put up one new fence on the strip. It is significant that no one of such uses was made by any other person.

It is conceded by all that the land in controversy one side of which was along Deercreek, one side along Route 56 and the third adjoining defendant's land, was suitable to be used as pasture land only. The growth on it was sparse, it was rough, washed at times and had gulleys through it. So that, the practical use to which defendant put this land was such as would be made by an owner in its normal operation. Indeed it is difficult to bring to mind any practical use of this land to defendant and his father other than that to which they put it. This use was sufficient to disclose an intention of the defendant to appropriate this land. Ewing v. Burnett, 11 Peters 41, 10 F. D. 574, cited with approval in **Clark v. Potter, 32 Oh St 63.**

But it is urged that the use by the defendant was permissive. We do not so read this record. Indeed, we find only one part of the testimony which requires this conclusion. In the last few questions and answers of Mrs. Homer Robison the following appear:

Q. Did she (referring to Mrs. Lucas) say how he (referring to defendant, Rapp) happened to use it?

A. No, she didn't.

Q. Did she indicate whether it was by permission or not?

A. No.

Q. To refresh your mind and memory, did she say they always let Elwood Rapp use it?

A. Yes.

In this last answer it was inferable that Elwood Rapp used the land permissively.

The trial judge was of opinion that C. P. Rapp, the father of defendant. knew that the Alkire farm was being partitioned; that he knew that a survey was being made; that he saw the monument marking the southwest corner of the 4.32 acres and saw them measure the south line of the tract which faced his front door and seeing and knowing all of these facts, made no objection whatever but on the contrary gave tacit consent to these acts of ownership. If the record be so construed the conversation from which the foregoing conclusions are drawn occurred in 1922, some 24 years before this action was instituted. Catharine Lucas was not interrogated on cross-examination or rebuttal as to this conversation. The effect of C. P. Rapp's conduct was nothing more than an admission that evidence of the record title to the 4.32 acres was in the Alkire heirs. It does not appear that C. P. Rapp had no knowledge that the 4.32 acre piece belonged to the Alkire land. He may have known it long before the survey. The testimony goes to the good faith of C. P. Rapp in holding possession of some of the Alkire land and whether it was his obligation to speak in support of his holding. Some courts hold that the requisite of good faith applies only where one holds under color of title and not where there is actual adverse possession. 2 C. J. S. 741. His failure to speak did not affect the character of the use and his acts and conduct disclosed his open dominion and possession of the land. **McAllister v. Hartzell, 60 Oh St 69.**

An unusual development in the testimony is found in the statements of Catharine Lucas and her husband, Lawrence Lucas. Catharine Lucas was the daughter of C. G. Alkire who owned the land of which the 4.32 acre is a part before his daughter acquired it in 1922. She had lived on it almost continuously from her birth in 1897 and until she sold it in 1939. · She and her husband for 17 years lived on it. Although they made a warranty deed for their farm to the Cochrans Mrs. Lucas says that she nor her father "never used" and "never claimed" the piece in controversy. They both say that they knew that the Rapps were using the 4.32 acre piece for their purposes; that their stock grazed it and made the uses of it that an owner would and that they, the wit-

nesses, believed that this piece belonged to the Rapps. They further say that they never gave the Rapps permission to use the land and that they received no compensation whatever in any form for its use. Neither does it appear that there was an agreement at any time between the true owners and the Rapps which would indicate permissive use. Nor, is there any showing that any prior owner of the Alkire land received in any manner or form payment by way of rent for the use of the 4.32 acre piece from the Rapps. Frank Miller and his son, neighbors and adjoining land owners to the defendant say that the 4.32 acre piece was reputed to belong to the Rapps.

In **Yetzer v. Thoman, 17 Oh St 132 & 133** Judge Brinkerhoff writing the opinion said,

"We think that under our statute of limitations, if a party establish in himself, or in connection with those under whom he claims, an actual, notorious, continuous, and exclusive possession of land for a period of twenty-one years, he thereby, except as to person under disability, acquires a title to the land; and this. irrespective of any question of motive or of mistake."

and later, page 134,

"If he intends a wrongful disseizin, his actual possession for fifteen years gives him a title; or if he occupies what he believes to be his own, a similar possession gives him a title. Into the recesses of his mind, his motives or purposes, his guilt or innocence, no inquiry is made. It is for this obvious reason that it is the visible and adverse possession, with an intention to possess, that constitutes its adverse character, and not the remote views or belief of the possessor."

If it is a fact that the owners of the title to the Alkire land knew that the 4.32 acre piece was a part of their land, they were put upon ample notice that Rapp and predecessors were openly using it as their own.

The defendant also testifies that it was his opinion that the 4.32 acre piece was included in his record title; but at least two witnesses say that on occasions he proposed to buy the 4.32 acre piece of land. The trial judge had a right to believe this latter testimony, but, if true, it did not change the character of the use of the land which then, and subsequent thereto, defendant made of it. Nor did the offer to buy divest him of his rights. As early as McAllister v. Hartzell, supra,

it was held that neither a mere offer to buy within the 21 years nor an acknowledgment by the claimant within that time that the title is in another, or that the claimant does not own the land, will have the effect of estopping the claimant to plead the statute of limitations in an action of ejectment.

The use of this triangular strip of land, at least as far back as 1920, probably longer, and continuously since, has been adverse to the owners of the record title. It was so considered and acknowledged not only by the defendants and their predecessors in title but by the owners of the Alkire land. Indeed nothing of consequence was done by any owner of the Alkire land in derogation of defendant's title until the plaintiff acquired it in 1946. The fact that Cochrans deeded to the plaintiff by quit claim only may have reflected their opinion that the title might be doubtful.

We are satisfied that, giving full benefit to the trier of the facts of all of his prerogatives, the finding and judgment is against the manifest weight of the evidence.

We give some attention to cases cited in support of the judgment. Walker v. Maynard (Tex. Civ. App.) 31 S. W. (2d) 168,

"mere running of stock on open range and an occasional cutting of wood is not sufficient notice of adverse possession."

In this case the possession relied upon was the use of an open range in common with others and the occasional cutting of wood on the land. In De Las Fuentes v. McDonald (Tex.) 20 S. W. 43, the land was grazed by others than claimant.

In Doctor v. Turner (Mich.) 231 N. W. 115, the adverse possession relied upon was an occasional or periodical entry to cut wild grass and it was held that this was not sufficient to manifest purpose to take possession as owner and to constitute actual possession.

Perry v. Stephens (Tex. Civ. App.) 97 S. W. 1075, the court held that the claimant had no actual possession of the land in controversy.

Haynes, et al v. Texas and N. O. R. Ry. 111 S. W. 427. Here, there was only occasional cutting of wood and pasturing of stock on unenclosed land and it was held that this was not such possession and occupancy as would affect the title of the true owner. It is not necessary to comment on the difference in the factual development in the cited cases and in the instant case.

Shuster v. Davis, 7 Abs 342. It is asserted that the facts in this case are similar to those found here. The property

in question laid on the same side of the established line as the other land of the plaintiff and the record title was in the plaintiff, the reverse of the facts here as to location of the land. The defendant claimed that her cattle had for years crossed the creek, occupied a strip lying beyond the stream and on the side of the plaintiff and there grazed and that she and her predecessors had sold some gravel off the strip. The court held that she did not show exclusive and adverse possession, that the use of the land by her cattle was by no means continuous nor were all of the acts of occupancy shown by her to have been continuous. It is in this case that the quotation is made from 1 R. C. L. 693, that one claiming title by adverse possession

"must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest."

This is highly colorful language but given its practical application, it reasonably appears that the defendant here and his father observed all of the obligations cast upon them by the quotation and that to hold otherwise is manifestly against the weight of the evidence. Cases on adverse possession are legion and we will not prolong this already too lengthy opinion by discussing them further.

The over-all picture here is that this small strip of land was long recognized by the title holders to be of little or no value to the Alkire farm because of its separation from the rest of the farm by road and stream; its thin soil and irregular contour, and the difficulty of reaching it, fencing and farming it. On the other hand, it had utility value for defendant and his predecessors in title because it was contiguous to their land and naturally fitted into and became a part of their farm. In the situation thus presented it appears that plaintiff's predecessors in title abandoned and defendant and predecessors appropriated the 4.32 acre piece and possessed it adversely for 21 years, and more, prior to the institution of the suit to quiet title.

A careful consideration of this record is convincing that the judgment should be reversed and the cause remanded for new trial.

It will be so ordered.

MILLER, PJ, HORNBECK and WISEMAN, JJ, concur.