**OGLETREE et al. v. EVANS et al.**
No. 4739.

Court of Civil Appeals of Texas.
Beaumont.
March 20, 1952.

Rehearing Denied May 7, 1952.

V. A. Collins and Ross Hightower, Livingston, Barnes & Barnes, Beaumont, for appellants.

Campbell & Foreman, Livingston, Blades, Kennly, Fisher & Whitworth Houston, Pollard, Lawrence & Reeves, Tyler, for appellees.

COE, Chief Justice.

Appellants, who were the plaintiffs in the trial court, sued appellees in trespass to try

title for the title to and possession of the West half of the Dillard L. Marsh Survey in Polk County, Texas, and for recovery of damages for timber cut and removed therefrom. Appellees Evans, who were the defendants in the trial court, disclaimed as to all of the land sued for except that portion thereof lying within their enclosure. Most of the land sued for was within this enclosure as was shown by the evidence. With respect to that portion of the land sued for lying within their enclosure, such appellees pleaded not guilty and specially pleaded the 10-year statute of limitation. Appellees Cade were not claiming the land sued for or any portion thereof. They cut and removed certain timber from the land in controversy, such cutting being done by virtue of their purchase of such timber from Joe Scott Evans under his timber deed covering same. Appellees Cade answered by a plea of not guilty and the 10-year statute of limitation, and they also filed a cross-action against appellees Evans in which they sought judgment over and against such appellees in the event of a recovery by appellants against appellees Cade. At the close of all the evidence in the case, both appellees and appellants filed and presented their motions for instructed verdict, such motions were overruled and both parties excepted.

In response to the one Special Issue submitted by the court, the jury found that appellees Evans had had exclusive, peaceable and adverse possession of the land in controversy, using or enjoying the same for the period of 10 years prior to the filing of this suit. The trial court rendered and entered judgment that appellants recover that portion of the land sued for to which appellees Evans disclaimed, but that appellants take and recover nothing as against appellees Evans with respect to the land which was within their enclosure and described by metes and bounds, and that appellants take nothing as against all appellees with respect to the timber cut and removed by appellees Cade. From this judgment the appellants, who were plaintiffs in the trial court, have properly perfected their appeal to this court, and have filed a brief in which they assign five Points of Error in which they ask this court to reverse and render this cause as to the title to the land and damages for the manufactured price of the timber cut and removed by appellees Cade.

By appellants' first point they contend that the fence of appellees around the land in controversy was insufficient to give appellees exclusive possession of the land claimed by them and therefore as a matter of law they would not be entitled to recover the title to such land under the 10-year statute of limitation, and cite as authority to sustain their contention Article 3947 and Article 6942, Revised Civil Statutes of Texas, which define what constitutes a lawful fence. They also cite the case of Carrington v. Carrington, Tex.Civ.App., 230 S.W. 1029; Ellender v. Holland, Tex. Civ.App., 221 S.W.2d 990; Houston Oil Company v. Howard, Tex.Civ.App., 256 S.W. 340; Posey v. Coleman, Tex.Civ. App., 133 S.W. 937 and Clarendon Land Investment & Agency v. McClelland, Tex. Civ.App., 35 S.W. 474.

Preceding Special Issue No. 1, the trial court gave the jury, among other things, these instructions: "By the term 'peaceable possession', as that term is used in this charge, is meant such possession as is continuous and not interrupted by an adverse suit to recover the land involved."

"By the term 'adverse possession', as that term is used in this charge, is meant exclusive possession, actual and visible appropriation of the land involved, commenced and continued under a claim of right inconsistent with and hostile to the claim of another."

"By the term 'claim of right', as used in this charge, means the assertion of a claim by the adverse possessor to the land in controversy hostile to and inconsistent with the claim of any other person." Then follows Special Issue No. 1, which inquired of the jury whether the appellees or those from whom they claim, have had exclusive, peaceable and adverse possession of the land described in the defendants' second amended original answer filed in this cause, using or enjoying the same for a period of 10 consecutive years prior to August 10, 1949, to which the jury answered "Yes".

The evidence shows that the land in controversy was suitable for raising timber and grazing stock; that that portion of Polk County where the land was situated had no stock laws of any character and was referred to by some witnesses as "free range". The land in controversy was used by appellees for the purpose of grazing cattle and some horses, and the fence was a barb wire fence. There was evidence that it was maintained in a manner sufficient to hold cattle inside of it and to keep other cattle on the outside from going in, generally speaking. It was not such a fence that would prevent sheep, goats or hogs from entering into or from the land in controversy, and it is appellants' position that since such fence was not sufficient to turn sheep, goats and hogs and other like animals, it was insufficient to give them exclusive possession of the land.

■ Appellants do not seem to question the sufficiency of the evidence to sustain the finding that appellees Evans had been in possession of the land for 10 consecutive years, using it as a pasture and during which time it was enclosed by their fence, and make no contention that at any time during the 10 years that the Evans' cattle and stock were not pastured on the land; their main contention being that before appellees could mature title to the land by virtue of the 10-year statute of limitation they must have had it fenced so as to prevent any kind of stock from entering upon or leaving said land. Therefore we feel it unnecessary to summarize all of the evidence with reference to the use and occupancy of this land and will not do so further than to say that the evidence was sufficient to show that the appellee Fred Evans went into possession of the land in controversy in 1934, and that such land which was enclosed, and what was known as the middle pasture, had been in possession of him, his father and his two brothers (the other appellees here) since that time; that Joe Scott Evans, one of the appellees, went into joint possession with Fred Evans in the early part of 1935 after his son, Fred, had given him that portion of the West half of the Marsh Survey within the enclosure, which is the land in controversy, and that he remained in possession thereof until 1948, when he conveyed an undivided interest to each of his three sons, W. Fred, Joe Scott Evans, Jr., and R. F. Evans, and that the land was continuously used by them after such deeds, for the purpose of pasturing their cattle and horses. We do not understand it to be the law that before a party can mature title by limitation of land which he has under fence, claiming, using and occupying same for the purpose to which it is suited, that he must maintain such a fence as is defined in Articles 3947 and 6942 of the Revised Civil Statutes. These Articles have to do with impounding of stock by the owners of enclosure and the collection of damages by such owners from the owners of the trespassing stock. We have been cited no case and we know of none which hold that before a party can mature title by limitation to land under fence that he must have such fence as is defined in these Articles, nor such a fence as would be hog proof, goat proof or sheep proof. As we understand the cases dealing with this question, they hold that the enclosure must be substantial and must provide reasonable protection against cattle of ordinary disposition. In 2 Tex.Jur., 91, Sec. 47 it is said: "The claimant's assertion of title by limitation is sustained by proof that he enclosed the land and pastured cattle thereon for the period prescribed by the statute." And the fact that the limitation claimant's fence might need repairs from time to time or that there might be an opening in the fence from time to time does not defeat his title by limitation. See: Ross v. Houston Oil Field Association, Tex.Civ.App., 88 S.W.2d 586, at page 594, wherein it is said: "It is true the court found that Massey's fences were down in places at times and his gates were not always kept closed, especially as to the period from December of 1924 to the spring of 1926, but it further found, notwithstanding, upon amply supported testimony, that the land in controversy was continuously used by Massey in such a way as to make it clear to the world that he was using and claiming it adversely, that although some of the wires, posts, and

gates were down occasionally and for about a year between the two dates given, still he persisted throughout that and all of the other times in question in maintaining his pasture thereon; under the constructions placed upon the statute by our courts, these findings were sufficient to sustain a plea of limitation." See, also, Port City Co. v. Peck, Tex.Civ.App., 42 S.W.2d 275; Board of Trustees v. Brawley, 5 Cir., 86 F.2d 398; Peveto v. Herring, Tex.Civ.App., 198 S.W.2d 921.

█ The exclusiveness of the limitation claimant's possession is ordinarily one of fact to be determined by a court or a jury. We are unwilling to say that the evidence was insufficient, as a matter of law, to show that appellees had exclusive possession of the land in controversy. We therefore overrule appellants' Point No. 1.

Under appellants' Points Nos. 2 and 3 they contend that the appellees entered in possession of the land in controversy not under a claim of right but in subordination to the claim of another, and that the character of possession or use of the premises was not changed so as to give notice of a change of attitude of the possessor towards the premises from subordination to adverse, or notice otherwise brought home to the owner of the land of an adverse claim, and that therefore appellees did not, under the law, mature title by limitation to the land in controversy. The evidence shows that the land in controversy was enclosed as a part of what was originally known as the Lister Ranch, which seems to have been made up of two or more pastures. The land in controversy was enclosed in what was known as the middle pasture. This ranch was originally fenced by Walter Lister, who apparently was the owner of the Burch 160 acre survey upon which was located the ranch house. This ranch was fenced in the early part of the century and included at least the Burch Survey and the Dillard L. Marsh 320 acre survey. The East half of the Marsh 320 acre survey seems to have been owned by Wm. Cameron & Company, and was leased by Lister from the owner thereof. On July 18, 1912, R. S. Smith and his brother bought the Lister Ranch from Charlie Lister, and it seems

that they extended the fences so as to include other lands upon which they signed tenancy agreements, but never signed any tenancy agreement as to the West half of the Marsh Survey; neither did they claim the land as their own. The Smiths sold this property to a Mr. Blackerby in 1927 and Hugh Pike went into possession of the ranch, including the land in controversy, by permission of Mrs. Blackerby, the surviving widow of M. Blackerby, who died about 1933. Mr. Pike was in the cattle business and used the ranch for pasturing his cattle. In 1934 Mr. Pike sold such cattle as he then had to Fred Evans, along with his rights to the possession of the ranch. There was testimony that at the time Fred Evans went into possession of the ranch, and especially the middle pasture, in 1934 he claimed all of the land within the enclosure which was not under lease and which included the land in controversy. In the early part of 1935 Fred Evans gave to his father, Joe Scott Evans, his claim to that portion of the West half of the Marsh Survey which was enclosed by what was known as the middle pasture. Mr. Joe Scott Evans immediately went into possession of the land in controversy, claiming it as his own, and continued to claim that portion of the West half of the Marsh Survey that was enclosed in the pasture fence until he deeded an undivided interest therein to his three sons. It was not shown that either of the parties who were in possession of the Lister ranch, including the land in controversy, at any time ever acknowledged tenancy or made any character of lease agreement with anyone covering the West half of the Marsh Survey. Appellants contend that since none of the appellees' predecessors in possession of the West half of the Marsh Survey ever asserted any claim to the land, but only claimed the right to use it for pasture purposes; that they were holding such land in subordination to the true owner of the land, and since the Evans took their possession from such non-claimants that their possession, as a matter of law, was subordinate to the record owner of the land; and since they did nothing to change the character of the possession thus obtained,

it would not constitute notice to the owner of an adverse claim and they could not as a matter of law mature title by limitation to such land. There is no evidence in the record as to whether Mr. Lister, who originally enclosed the land in controversy, either did or did not claim title thereto. However, as heretofore stated, it was shown that neither of the parties who followed Lister in possession of the land asserted any claim thereto until Fred Evans took possession thereof in 1934.

██ We are aware of the well settled rule that when a party enters into possession of land under an arrangement with a tenant, he automatically becomes a tenant himself and will remain such until such facts are shown as would bring home notice to the owner that such tenancy had been repudiated, but we know of no authority for holding that one who enters into possession of land under arrangements with a trespasser thereon, as appellees' predecessors in possession seem to have been, cannot enter under a claim of right and set the statute of limitation in motion and mature title to such land after having used and occupied it for the required length of time under such claim of right. Furthermore, we can see no sound basis for such holding as no one shown to have been in possession of the land in controversy ever had any dealings whatsoever with the appellants or those under whom they claim, and as far as we can ascertain there is no showing that the appellees, or any person under whom they claim, ever knew who claimed to be the owners of the land. There being no obligation upon either of them to protect or honor appellants' title or claim of title, we are unable to see how such an obligation can rest upon one entering upon the land with their consent.

██ By appellants' 4th Point, they complain of the action of the trial court in refusing to give a requested charge to the jury to the effect that if others, without the consent of defendants especially given, had habitually used or enjoyed said land in common with defendants for pasturage or other purposes for which same was adapted, defendants' possession for such time as used by others was not adverse. This point is overruled for the reason that there was no evidence to indicate that others had habitually used or enjoyed the land in controversy in common with the appellees for pasturage or other purposes for which same was adapted, except that one witness, a Mr. Crimshaw, testified that he had been on the land in controversy hunting hogs. There is nothing to indicate that anyone used this pasture without consent of appellees for pasturage purposes. In fact, there is nothing to indicate that the witness Crimshaw habitually used the land in hunting for hogs. In addition to the foregoing, we feel that the matter was amply covered in the court's charge which has heretofore been referred to.

██ Under appellants' 5th Point, they contend that they are entitled to recover from the Cade Lumber Company for the manufactured price of the timber cut and removed from the land, which was agreed to be $50 per thousand feet. Inasmuch as we have reached the conclusion that the trial court entered a proper judgment as to the title to the land in controversy, it necessarily follows that appellants were not entitled to recover any amount for the timber cut and removed therefrom, therefore we cannot see how it could serve any useful purpose for us to discuss this point. Neither do we feel it necessary to discuss appellees' 6th counterpoint under which they contend that appellants as plaintiffs in the trespass to try title action, failed to discharge their burden and show title to the land in controversy. Under this point they point out several serious defects in plaintiffs' record title, but inasmuch as we have concluded to affirm the judgment of the trial court on the question of limitation, we will not undertake to enter into a discussion of appellants' title.

It follows from what we have said that we are of the opinion that the trial court's judgment should be affirmed, and it is so ordered.