664 P.2d 210

Ross OVERSON, Third Party
Plaintiff-Appellee,

v.

Graham COWLEY, Eva Cowley, Hugh
Cowley and Helen Cowley, Third Party
Defendants-Crossclaimants-Appellants.

No. 1 CA–CIV 5290.

Court of Appeals of Arizona,
Division 1, Department B.

Oct. 19, 1982.

Rehearing Denied March 16, 1983.

Review Denied April 12, 1983.

Tanner, Jarvis & Owens by Wallace O. Tanner, James L. Tanner, Phoenix, for third party plaintiff-appellee.

Beus, Gilbert, Wake & Morrill by Neil Vincent Wake, Leo R. Beus, Phoenix, for third party defendants-crossclaimants-appellants.

## OPINION

YALE McFATE, Judge (retired).

This is an appeal from a summary judgment quieting title to forty acres of land near St. Johns, Arizona, in favor of appellee Overson and against appellants Cowley. The case originated with a complaint filed by Nickolaus and Barbara Greer, as lessees of appellants, seeking to enjoin Overson from trespassing on the land. Overson broadened the action by bringing in numerous "third-party defendants",[1] including appellants, seeking to quiet title to the forty acres and claiming adverse possession for more than ten years. In the ensuing litigation the Cowleys filed a counterclaim to quiet title in their names and thus became the primary litigants against Overson.

In early November, 1975, both parties filed motions for summary judgment which were initially denied. Eventually the court, on December 30, 1975, entered a minute order granting Overson's motion, thus recognizing his claim of adverse possession. The Cowleys filed a motion for rehearing or new trial on March 8, 1976, which was denied by minute entry on May 16, 1977. No signed order or judgment was entered in the case either with respect to the original motions for summary judgment or with respect to the Cowleys' motion for rehearing or new trial. The case apparently lay dormant for almost two years when on April 26, 1979, the Cowleys, through their new counsel, filed a renewed motion for rehearing or new trial. Simultaneously, they filed a separate motion for leave to file additional affidavits. On October 2, 1979, the court denied the renewed motion for rehearing or new trial, but made no ruling on the motion for leave to file additional affidavits. The parties have treated the omission as tantamount to a denial.

A final judgment quieting title to the land in Overson was entered February 29, 1980, which contained certification pursuant to 16 A.R.S., Rules of Civil Procedure, Rule

1. These additional parties plainly were not proper third-party defendants within the meaning of 16 A.R.S., Rules of Civil Procedure, Rule 14(a). Although designated as such in the pleadings, they have been treated throughout the litigation as additional counter-defendants under 16 A.R.S., Rules of Civil Procedure, Rule 13(h).

54(b). A signed order denying the motion for new trial was entered March 7, 1980. This court has jurisdiction pursuant to a timely notice of appeal and A.R.S. § 12–2101(B) and (F)(1).

Appellants present three basic contentions in seeking reversal of the judgment: (1) the summary judgment establishing Overson's adverse possession claim was improper because there were disputed issues of material fact to be tried; (2) the court should have granted the Cowleys' motion for a summary judgment; and (3) the court abused its discretion in denying the Cowleys' motion for leave to file additional affidavits to rebut Overson's motion for summary judgment. We shall deal with these issues in the order listed.

■ On motion for summary judgment, neither the trial court nor this court may weigh the evidence. *Northern Contracting Co. v. Allis-Chalmers Corp.*, 117 Ariz. 374, 573 P.2d 65 (1977). All facts shown by the record, and all reasonable inferences which may be drawn from the evidence, must be considered in a light most favorable to the party against whom judgment is sought. If there is the slightest doubt or uncertainty in respect to any issue of material fact, the request for summary judgment should be denied. *Gulf Insurance Co. v. Grisham*, 126 Ariz. 123, 613 P.2d 283 (1980); *Wisener v. State*, 123 Ariz. 148, 598 P.2d 511 (1979); *Lujan v. MacMurtrie*, 94 Ariz. 273, 383 P.2d

187 (1963); *Schmidt v. Mel Clayton Ford,* 124 Ariz. 65, 601 P.2d 1349 (App.1979); *Combs v. Lufkin,* 123 Ariz. 210, 598 P.2d 1029 (App.1979).[2]

Overson filed the first motion for summary judgment. The following is an overview of the factual record relied on by him at that time. Overson testified he owns the land contiguous to the west side of the forty acre tract and has kept cattle thereon for over forty years. He bought the forty acres from Bud (Graham) Cowley for $300.00 in the early 1940s, and fenced it on three sides, tearing down the existing fence on the west side of the tract which separated the two properties. He was promised a deed but did not get it. He testified he grazed cattle on his land, including the forty acre tract, under claim of ownership continuously every day for thirty years, averaging twenty head per year. The City of St. Johns commenced construction of a road along the west boundary of the property and he stopped them, negotiated with them and later gave permission, through his attorney, to construct the road. He also gave permission to the power company to put in electric lines, executing a written easement. He gave permission to the Cowleys to take some rock about twenty-five or thirty years ago. Other than that, he is not aware of the Cowleys taking anything else off the property. On October 10, 1961, he tendered a quit claim deed to each of the Cowleys pursuant to A.R.S. § 12–1103[3], demanding

**2.** In determining whether material fact issues existed precluding entry of summary judgment for Overson, we should consider only those documents, depositions and affidavits which were before the court at the time the order for judgment was entered. However, if the order for judgment was appropriately entered and, if upon consideration of the issue concerning the court's discretion in denying the Cowleys' motion for leave to file additional affidavits, we should determine the court abused its discretion in refusing to consider the further affidavits tendered after its decision and before final judgment, then we should assess the propriety of summary judgment for Overson in light of the new affidavits as well as the original evidence. Otherwise, absent an abuse of discretion, we need only consider the record as it existed when the court made its minute order granting summary judgment. As to the denial of their own motion for summary judgment,

the Cowleys concede that in review "the court should look only to the original evidence of record as of the date of oral argument on the cross motions for summary judgment .... This is because Overson has not yet presented controverting affidavits to Cowleys' new affidavits, the trial court having denied the Cowleys' renewed motion for rehearing or new trial without ruling on the motion for leave to file additional affidavits."

**3.** This statute reads, in material part, as follows:

§ 12–1103

\* \* \* \* \* \*

B. If a party, twenty days prior to bringing the action to quiet title to real property, requests the person, other than the state, holding an apparent adverse interest or right therein to execute a quit claim deed thereto,

that they execute and return it. Along with the demand, he tendered the requisite five dollars and threatened to bring action to quiet title on failure to comply. The demand was formally refused by the Cowleys on October 27, 1961.[4] At no time during Overson's continuous use and occupancy of the property did the Cowleys make any effort to remove or dispossess him. He has exercised complete control over the property and "kept people off." During the spring of 1974 the Cowleys' lessee, Greer, started to re-fence the west side. Overson removed the single post Greer had put there, ordered him to stay off the property and keep his cows off, and put a "no trespassing" sign on the property. Greer complied with the demand.

A few days after Overson filed for summary judgment, the Cowleys filed a cross-motion, seeking the same relief, and both motions were considered simultaneously.

A resume of Graham Cowley's pertinent deposition testimony and original affidavit is as follows. The forty acres has never been "entirely fenced from adjoining properties." There was an old fence on the west side but it was in "bad condition." Overson, with Cowley's permission, fenced the north boundary in 1944. A fence has existed on the west and south sides ever since he can remember. The property has always been "open" on at least one of the four sides. There was a fence on the east, but it is not on the boundary line. At times, some of the fences were in bad condition. The Cowleys operated a gravel plant on the forty acre site until about 1952, when it burned down. After that they discontinued taking gravel, except for their personal use "whenever they needed it." They also "cut some stays there in the salt cedar" about 1969–1970. Cowley denied having sold the property to Overson, stating that he gave Overson permission to graze cattle there

since the early 1940s and that Overson has had cattle on there "some of the time" ever since. He has not tried to dispossess Overson because "he wasn't hurting the property any." The Cowleys tried to use the property some of the time but couldn't keep the fences up. They gave the city an easement for a road, the irrigation company an easement for a pipeline, and the power company an easement for an electric line. A further affidavit by Graham Cowley, dated March 8, 1976, was attached to the original motion for new trial. No request was made to file it of record and apparently no issue is raised on appeal in reference to it. The affidavit refers to repairing fences, removal of gravel and salt cedar branches, and granting of easements during the period from 1965 to 1974.

The Cowleys contend that when all the stated facts and reasonable inferences to be drawn therefrom are considered, the record demonstrates several material factual issues which are genuinely disputed in respect to appellee's motion for summary judgment. Assuming all of the uncontested facts to be true, and resolving any conflict in favor of the Cowleys, we conclude that the summary judgment was properly entered. The facts will be discussed in greater detail, as necessary, in the course of our analysis of the Cowleys' contentions.

■ Before proceeding to the issues presented, however, it will be helpful to briefly review the basic principles relating to adverse possession. A person seeking to recover land from another having peaceable and adverse possession thereof, claiming title thereto and using and enjoying the same, must commence an action therefor within ten years after his cause of action accrues and he may not do so thereafter. A.R.S. § 12–526; *Knapp v. Wise,* 122 Ariz. 327, 594 P.2d 1023 (App.1979); *Walter v. Northern Arizona Title Co.,* 6 Ariz.App. 506,

---

and also tenders to him five dollars for execution and delivery of the deed, and if such person refuses or neglects to comply, the filing of a disclaimer of interest or right shall not avoid the costs and the court may allow plaintiff, in addition to the ordinary costs, an attorney's fee to be fixed by the court.

4. Overson's "third party complaint" in these proceedings, alleging ownership by adverse possession and seeking to quiet title, was filed August 21, 1974.

433 P.2d 998 (1967); *Rorebeck v. Criste,* 1 Ariz.App. 1, 398 P.2d 678 (1965).

■ *Rorebeck, supra,* sets forth the elements of an adverse possession claim, as follows:

Our statutes follow the generally held rule that in order for one to acquire title purely by adverse possession, such possession must be actual, open and notorious, hostile, under a claim of right, continuous for the statutory period (here 10 years), and exclusive. It is generally conceded that all of these elements must coincide before one may acquire title by adverse possession.

1 Ariz.App. at 3–4, 398 P.2d at 681. The claimant's possession must not only be such as to exclude the owner, but must be such that possession is not shared with any other person. *Morgan v. Barrett,* 17 Ariz. 376, 153 P. 449 (1915); *Bale v. Coffin,* 13 Ariz. App. 550, 479 P.2d 427 (1971); *Collins v. Smith,* 372 P.2d 878 (Okl.1962); *Adams v. Lamicq,* 118 Utah 209, 221 P.2d 1037 (1950). *See also,* 3 Am.Jur.2d *Adverse Possession* § 50, at 140.

■ The effect of the bar under the limitation statute, A.R.S. § 12–526, in an action to recover the property is to confer title on the adverse possessor. A.R.S. § 12–527; *Villescas v. Arizona Copper Co., Ltd.,* 20 Ariz. 268, 179 P. 963 (1919).

The first material fact issue suggested by the Cowleys centers around conflicting statements as to whether, when, and how well the land was fenced. The point is made, citing *England v. Ally Ong Hing,* 105 Ariz. 65, 459 P.2d 498 (1969), and *Ogletree v. Evans,* 248 S.W.2d 804 (Tex.Civ.App. 1952), that mere grazing on unenclosed land will not support a claim of adverse possession. Moreover, the Cowleys assert that where enclosure is relied upon as evidence of possession it must be complete. *Knapp v. Wise, supra.* As further support for the Cowleys' view, we are referred to A.R.S. § 12–526(B) which contains the language "acres actually enclosed", which wording, it is contended, reaffirms the need for enclosure in fact when fencing is an element of the type of use and possession at issue.

Overson's response is that the basis for the rule requiring fencing of property used for grazing is to supply notice to the owner that his property is being adversely claimed. Where actual notice of claim of ownership is conclusively shown by means of demand for quit claim deeds pursuant to A.R.S. § 12–1103, Overson contends, no fence is necessary to give notice. Furthermore, Overson asserts that the Cowleys acknowledged he had possession of the property. Overson further argues that the statute, A.R.S. § 12–526(B) is not applicable.

■ We shall first consider the impact, if any, of A.R.S. § 12–526(B), which reads as follows:

The peaceable and adverse possession referred to in subsection A shall not embrace more than one hundred and sixty acres, including the improvements or the number of acres actually enclosed if less than one hundred and sixty acres is so enclosed . . . .

This statute was not intended to require an enclosure in order to acquire the right to adversely possess 160 acres of land or less, but rather where adversely possessed land less than one hundred and sixty acres is actually enclosed, to confine the possessor's rights to that which is enclosed. Irrespective of whether the fence here was sufficient to turn cattle, Overson made no claim to land beyond the fence, hence the statute does not affect his claim.

We agree with the Cowleys that the record does not show the fencing on all four sides of the land in question was adequate at all times to turn cattle, and does show that the only use Overson made of the property, on which he relies to establish adverse possession, was the grazing of his cattle. The north and east sides of the forty acre parcel adjoin land owned by the Cowleys, the south side is contiguous to land owned by an irrigation company and on the west lies the land owned by Overson. In his deposition, Graham Cowley states that the forty acre parcel was "not entirely fenced" during the entire period of possession by Overson; that the fences "kind of

fell down" and as to the west and south fences, "its been up and down all the time, and when I have been out there why it wasn't always up." He conceded that Overson built a fence on the north side in 1944, but as to the east side he stated "there is a fence there but it isn't on the boundary."

In *England, supra,* our supreme court quoted with approval the following from *De Las Fuentes v. MacDonell,* 85 Tex. 132, 20 S.W. 43 (1892):

> Uninclosed land, in this state, has ever been treated as commons for grazing purposes; and hence the mere holding of livestock upon it has not been deemed such exclusive occupancy as to constitute adverse possession. There must be an "actual occupation of such nature and notoriety as the owner may be presumed to know that there is a possession of the land" * * * "otherwise, a man may be disseised without his knowledge, and the statute of limitations run against him, while he has no ground to believe that his seizure has been interrupted." (Citation omitted)

105 Ariz. at 69, 459 P.2d at 502.

After calling attention to the fact that our adverse possession statute was derived from Texas, the Arizona court said:

> We find the reasoning of the Texas court persuasive. In our own state, as in Texas, it is not uncommon for cattle to range at will across the open ranch lands. An owner of a mining claim over which cattle grazed would certainly not be expected to surmise that the rancher who owned these cattle was asserting any claim of right to his land. Such use must be viewed as permissive and for that reason does not fall within A.R.S. §§ 12–521 and 12–526 which confer title by adverse possession. We hold therefore that the mere grazing of cattle, absent any other acts of dominion over the land, will not support a claim to land based on adverse possession.

105 Ariz. at 69, 459 P.2d at 502 (Footnote omitted).

■ In order to satisfy the rule under discussion an enclosure need not always, under all circumstances, be in such condition that it will turn cattle. If a fence, because of the elements, vandalism or other cause be down, the rule is satisfied if it be restored within a reasonable time. What is reasonable depends on all the facts and circumstances, bearing in mind that the ultimate fact issue is whether the possession was under claim of right and exclusive and the owner was aware or should have been aware of it.

In *Ogletree, supra,* the Texas Court of Civil Appeals said:

> As we understand the cases dealing with this question, they hold that the enclosure must be substantial and must provide reasonable protection against cattle of ordinary disposition. In 2 Tex.Jr., 91, Sec. 47 it is said: "The claimant's assertion of title by limitation is sustained by proof that he enclosed the land and pastured cattle thereon for the period prescribed by statute." And the fact that the limitation claimant's fence might need repairs from time to time or that there might be an opening in the fence from time to time does not defeat his title by limitation. See: *Ross v. Houston Oil Fields Association,* Tex.Civ.App., 88 S.W.2d 586, at page 594, wherein it is said: "It is true the court found that Massey's fences were down in places at times and his gates were not always kept closed, especially as to the period from December of 1924 to the spring of 1926, but it further found, notwithstanding, upon amply supported testimony, that the land in controversy was continuously used by Massey in such a way as to make it clear to the world that he was using and claiming it adversely, that although some of the wires, posts, and gates were down occasionally and for about a year between the two dates given, still he persisted throughout that and all of the other times in question in maintaining his pasture thereon; under the constructions placed upon the statute by our courts, these findings were sufficient to sustain a plea of limitation."

248 S.W.2d at 806. *See Kelly v. Wilson*, 283 S.W. 696 (Tex.Civ.App.1926), where a fence was washed away by flood and not rebuilt at once. *See also Williams v. Rand*, 30 S.W. 509, 9 Tex.Civ.App. 631 (1895); *Sharrock v. Ritter*, 45 S.W. 156 (Tex.Civ.App.1898).

■ Overson's 1961 demand for quit claim deed evinces his claim of ownership to the land and sets forth the boundaries thereof. Other evidence before the court established without contradiction that Cowleys were aware of the nature of Overson's possession and that he grazed his cattle on the land. The record is inadequate to establish that the land in dispute was in fact "open range" during the period 1961–1971.

■ Overson's testimony was sufficient to show that he built fences on the three sides which were non-contiguous to his own land, thus identifying the 40 acre tract. Where adversely possessed contiguous land is used in conjunction with the possessor's own enclosed land, and for the same purpose, no adverse possession notice requirement would be served by erecting a fence between the two properties. The fences were sufficient as a prima facie showing on motion for summary judgment to identify the land being claimed by Overson. If appellants rely on some inadequacy, they should specifically allege it in their response. Appellants' response is equivocal and lacks specificity. Such expressions as "not always up" and "not entirely fenced" do not meet the requirements of 16 A.R.S., Rules of Civil Procedure, Rule 56(e), which requires a statement of specific facts showing a genuine issue for trial.

■ Likewise, the description of the east fence as "not on the boundary" does not indicate whether it was east or west of the boundary or how close in fact it was to the boundary. The issue, if any, is thus obscured, for Overson claimed only to the east boundary of the SW ¼ NW ¼ of the section, and under the language employed by appellants, the fence could have been within an inch of the east boundary line. Such a location would substantially serve the purpose of notice by enclosure.

Considering that fencing was in fact erected, and granting that it was not always in repair, coupled with the 1961 formal demand for quit claim deed, and the Cowleys' awareness of Overson's use for grazing within the fenced area, there seems little doubt that the Cowleys were placed on notice of Overson's adverse claim and the nature and exclusiveness of his possession. Under the facts of record, the purpose of the rule requiring enclosure has been satisfied.

■ Secondly, the Cowleys argue that the character of the land was such that mere grazing was not sufficient use and occupancy to support an adverse possession claim. They contend, citing *Rorebeck v. Criste, supra*, and *Knapp v. Wise, supra*, that Overson must show he used the land as would an ordinary owner of the same type of land, taking into account the uses for which it was suitable. Moreover, it is argued that mere grazing, to ripen into a claim for adverse possession, must be the only practicable use to which the land in question may be devoted. In this regard, they rely on *Fulton v. Rapp*, 45 Ohio Ops. 494, 59 Ohio L.Abs. 105, 98 N.E.2d 430 (1950), and *G O S Cattle Co. v. Bragaw's Heirs*, 38 N.M. 105, 28 P.2d 529 (1933). As the Cowleys correctly point out, there is no evidence in the record that grazing is the only practicable use for the land, and it was established that Overson put it to no continuous use other than grazing. To support a claim of adverse possession derived from cattle grazing, must it appear that grazing is the only practicable use for the land? Our analysis of *Rorebeck v. Criste, supra,* and *Knapp v. Wise, supra,* does not justify this conclusion. In those cases the Arizona rule is plainly stated that in order to establish a claim of adverse possession, the claimant must show that during the limitation period he occupied or used the land as would an ordinary owner of the same type of land, taking into account the uses for which the land was suitable. Thus, we see that there is no requirement under either of these cases that the adverse possessor's use must be the only practicable use to which the land in question might be devoted.

The Cowleys, however, rely on the Ohio and New Mexico cases of *Fulton v. Rapp, supra,* and *G O S Cattle Co. v. Bragaw's Heirs, supra,* as authority for the special rule they advocate. Neither of these cases hold, as contended, that adverse possession of grazing land may not be asserted unless grazing is the only practicable use for the land. *Fulton* is authority for the proposition that if "the land was suitable to be used as pasture land only", then using it *for* that purpose was "such (use) as would be made by an owner in its normal operation." *Fulton v. Rapp,* 98 N.E.2d at 432. *Bragaw* held that adverse possession of the land in question exclusively for grazing was exclusive possession where the claimant and its predecessors were the only ones to use the land.

In the Cowleys' third attack against Overson's claim of exclusive possession, they assert that after the gravel plant (which they had operated on the property to obtain gravel for their former contracting business) burned down about 1952, they discontinued taking gravel for commercial purposes but continued to take gravel for their own personal use. The only evidence before the court at the time of granting summary judgment which bears on this issue is found in Graham Cowley's deposition, and is as follows:

Q Since 1952 have you put that property to any other use?

A Well, we've used gravel from there and then we were planning on drilling a well there and I had, we fixed a pit over there to drill a well, oh, in about '53. And then we've used gravel from there whenever we needed it.

Whether any need arose for gravel during the statutory limitation period, 1961–1971, is not shown. For all that appears, the Cowleys' total "needs" could have arisen between 1953 and 1961 or between 1971 and 1975. However, the Cowleys insist the

facts justify an inference that gravel was taken during the ten year period of possession claimed by appellee. But if such an inference is permissible, an opposite inference is equally reasonable. We find no factual basis for either inference, not even an "educated guess", the sole fact being that gravel was taken "when needed" during a span which overlaps by eleven years the relevant period of time.

■ Much of our characterization of the Cowleys' position with respect to the taking of gravel applies equally to their next proposition that "Cowleys' harvesting of timber in the 1960s was a sufficient entry to stop the limitations period." Again, the only reference to this harvesting activity is found in Graham Cowley's deposition and consists of questions and answers as follows:

Q Have you put the property to any other use than possible gravel use?

A We cut some stays there in that salt cedar.

Q When was this?

A Oh, five or six years ago.[5]

Assuming these branches, apparently used as stays for fence wires, can be classified as "timber",[6] we find nothing to indicate the circumstances of the cutting or whether the casual entry on the land for this purpose was known by, or brought to the attention of, Overson.

In *Higginbotham v. Kuehn,* 102 Ariz. 37, 424 P.2d 165 (1967), an adverse possession case, the owner tore down a fence which stood about one and one-half feet inside his true property line and erected a hogwire fence at approximately the same location. Years later, the owner attempted to use the area between the fence and the property line, precipitating the lawsuit. Our supreme court, pointing out the lack of any evidence of intent to re-enter the strip of land in question during the limitation period, quoted with approval from *Kirby Lumber Corp. v. Smith,* 305 S.W.2d 829, 830 (Tex.Civ.App.1957), as follows:

---

5. Cowley's later affidavit, attached to the renewed motion for rehearing or new trial, *is* more specific, relating the taking to "two or three times during the mid 1960s."

6. Salt cedars are tamarisks, with long slender branches, which grow in a saline desert soil.

To constitute an interruption of an occupant's adverse possession, an entry by the owner must be made with the intention of taking possession. Such an entry by the owner, in order to defeat another's adverse possession, must clearly indicate to the occupant that his possession is invalid and his right challenged. It must be open and notorious and bear on its face an unequivocal intention to take possession. It cannot be accidental, casual, secret, or permissive. (Citation omitted).

102 Ariz. at 39, 424 P.2d at 167. *Cf. Gusheroski v. Lewis,* 64 Ariz. 192, 197, 167 P.2d 390, 393 (1946) (adverse possession must be "physically interrupted so that it cannot be held to be continuous"); *Gospel Echos Chapel, Inc. v. Wadsworth,* 19 Ariz.App. 382, 507 P.2d 994 (1973) (mowing grass and trimming oleander hedges); *Wise v. Knapp,* 3 Ariz.App. 99, 412 P.2d 96 (1966) (involving two instances of use of a roadway); *Rorebeck v. Criste, supra* (cutting weeds and killing ants).

We conclude that the branch cutting incident (or incidents, if more than one occurred) referred to in Cowley's deposition is insufficient on this record to establish a re-entry by the owner of a nature calculated to interrupt the running of the statute of limitations.

The next issue claimed to be material and subject to a bona fide factual dispute relates to a road on the land, constructed around 1965 by the City of St. Johns along the section line common to the two properties, providing access to the nearby recreational area. The Cowleys claim they gave the city an easement for the roadway along the west edge of the forty acre parcel, that the road was thereafter constructed, and that the city's entry on the land for such purpose pursuant to the easement was sufficient to interrupt any exclusive adverse possession by Overson. They rely on *Hinds v. Killough,* 332 S.W.2d 101 (Tex.Civ.App.1959), as authority for this proposition. However, Overson claims to have likewise given the city permission to build the same road and there was nothing in the record to directly contradict his claim. The Cowleys, however, argue the evidence fails to establish that Overson's permission was given before entry by the city, and that if given after entry it was too late to affect the interruption of his possession. Overson's testimony that he granted permission to the city was sufficient to demonstrate an exercise of dominion over the property in support of his motion for summary judgment.

If appellants rely on a previously granted permission by them to construct the same road as constituting a re-entry, they should have responded with a showing of the relevant facts. The record merely shows that the city obtained permission from both parties. However, there was no evidence contradicting Overson's statement that "they started it and I stopped them." Assuming a prior permission granted by appellants, it would appear that the attempted re-entry pursuant to such permission was ineffectual at that time. Where the movant shows prima facie entitlement to summary judgment, under 16 A.R.S., Rules of Civil Procedure, Rule 56(e), it is incumbent on the adverse party to "set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." No such facts of a prior re-entry were presented by appellant.

If Overson, after discovering the city's activities on the land, stopped them and they did not continue until after he granted permission to do so, then the attempted entry was aborted, the subsequent activities were permissive, and the easement granted by the Cowleys did not in fact accomplish a physical interruption of Overson's adverse possession. On the record before us, we reject appellants' argument that an issue of fact existed as to Cowleys' re-entry by way of granting a road easement to the city.

Lastly, the Cowleys propose that the record justifies a finding that in 1971 their agent, Jake Scarborough, built a fence along the west side of the forty acre tract to separate it from Overson's land, interrupting the ten year period of exclusive possession. If such a fence was constructed

after the period of limitations had run, *i.e.,* after October 10, 1971, it would not affect Overson's title, if indeed he had acquired title by that date. *Fritts v. Ericson,* 103 Ariz. 33, 436 P.2d 582 (1968). On the other hand, if Scarborough in fact built a fence for the Cowleys along the west boundary during the period of limitations, with intention to reclaim the land, it would be evidence of a re-entry by the Cowleys. In regard to fencing the west side at any time after October 10, 1961, the only evidence presented to the court prior to its minute order granting summary judgment was the testimony of Cowley, as follows:

Q Okay, did you make any attempt to dispossess Ross Overson from the use of that property?

A Not at that time (referring to 1961).

Q At any time did you make any effort to dispossess Ross Overson?

A I haven't tried to, he wasn't hurting the property any.

Q So he continued to use it and is still using it up to the present time?

A Well, I tried to, we tried to use it some of the time, but we couldn't keep the fence up.

(Cowley's later affidavit, attached to the motion for new trial of March 8, 1976, delineated the time period during which Scarborough repaired or built fences as sometime "during the years 1965 to 1974.")

All of this testimony relates to a time period extending beyond the ten year limitation period relied on by Overson. Assuming title by adverse possession was acquired in October 1971, subsequent efforts by the Cowleys to effect a re-entry would be to no avail. *Fritts v. Ericson, supra.* Again, the Cowleys failed to establish that a genuine material issue existed with regard to interruption of the limitation period by Scarborough's alleged fence building activities on the west side.

We hold the record was sufficient to justify entry of a summary judgment for Overson.

## THE COWLEYS' MOTION FOR SUMMARY JUDGMENT

The trial court denied the Cowleys' motion for a summary judgment. The Cowleys base their claim of error in this denial on the supposition that the record shows: (1) their taking of gravel was continuous, thus preventing Overson's adverse possession from becoming exclusive, and (2) Overson's adverse possession, if any, was interrupted when the Cowleys entered the land to cut wood in the mid 1960s and to construct fences in 1971. The Cowleys apparently have not included their granting of the easement as a ground for reversal of the court's order denying their motion for summary judgment. As we noted before, the record of facts justifies a summary judgment for Overson, and we hold that the same factual record prevents summary judgment for the Cowleys.

## MOTION TO FILE NEW AFFIDAVITS

■ We now reach the issue on appeal whether the court abused its discretion in failing to grant the motion to file additional affidavits. The renewed motion for new trial and for reconsideration of the decision awarding summary judgment was based in part on affidavits which were attached to the motion for leave to file them, and were specifically referred to in the motion for new trial. The motions were filed concurrently. Failure of the trial court to rule on the motion to file additional affidavits, followed by denial of the renewed motion for new trial and entry of final judgment, leads us to conclude the trial court considered them inadequate to justify a new trial. We therefore approach the issue presented here as though the court had denied the motion.

The proposed affidavits were in no sense concerned with newly discovered evidence; therefore the only basis for entertaining the motion would be to support the motion for new trial under 16 A.R.S., Rules of Civil Procedure, Rule 59(a)(8), which reads:

A verdict, decision or judgment may be vacated and a new trial granted on motion of the aggrieved party for any of the following causes materially affecting his rights:

8. That the verdict, decision, findings of fact, or judgment is not justified by the evidence or is contrary to law.

Appellants advance the following arguments: first, Overson allowed almost 2½ years to pass without obtaining a final appealable judgment after the court's decision in his favor; secondly, the proposed new affidavits conclusively demonstrate that Overson has no just or meritorious claim for adverse possession, and lastly, because of lack of clarity in the original evidence presented, the court should be receptive to affidavits which "clarify" certain aspects of such evidence. In response, appellee points to the rule that amendments to affidavits on summary judgment must be seasonably sought and the Cowleys should not be permitted to "change their testimony" four years after the original testimony was given; that the later proposed affidavits are contradictory and self-serving and do not establish material issues of fact.

■ In the exercise of its judicial discretion, the court may consider the long delay in seeking relief. Each party attempts to blame the other for delay, appellants referring to Overson's delay in procuring a final appealable judgment and appellee pointing to the delay of appellants in moving for reconsideration of the decision and in seasonably presenting their new affidavits.

Appellants' right and opportunity to seek relief in the trial court were not affected by the delay in entry of judgment. We perceive of no reason why their motion to submit new affidavits directed to the summary judgment issue could not have been made either before the court's ruling or within a reasonable time thereafter. There is no reasonable explanation in the record for the long delay. The affidavits contain factual statements which were within the knowledge of appellants at all times material to the case. Counsel for appellants concede this, for in their trial court memorandum filed May 22, 1979, they state:

Indeed, all of the evidence contained in the proposed new affidavits pertains to matters of which the Cowleys themselves were aware and which they themselves brought to the attention of their undersigned new attorneys.

16 A.R.S., Rules of Civil Procedure, Rule 1 reads in part as follows:

These rules ... shall be construed to secure the just, speedy and inexpensive determination of every action.

The procrastination, long inaction and inattention to litigation shown by the record here violates the first rule of civil procedure. This is apparent when we consider the limitation on the time within which certain action in similar or analogous cases may be taken. For example, a motion to set aside an order entered by mistake, inadvertence, surprise or excusable neglect, or for newly discovered evidence, or fraud, misrepresentation or other misconduct of an adverse party must be made within six months after entry of the order. 16 A.R.S., Rules of Civil Procedure, Rule 60(c).

In *Jabczenski v. Southern Pacific Memorial Hospitals,* 119 Ariz. 15, 579 P.2d 53 (App.1978), a summary judgment was entered against plaintiffs in favor of one of the defendants. Plaintiffs moved to reconsider on the ground they had no opportunity to fully explore the fact issues involved, and the granting of the "quickie" summary judgment was improper. The court's decision denying the motion to reconsider was affirmed on appeal. The court held that a party litigant claiming to be deprived of a timely opportunity to present additional evidence to the court in opposition to a motion for summary judgment may not be heard to complain after the motion is decided against him, where he had nine months to obtain the evidence prior to the motion. *A fortiori,* one who, having had an opportunity to do so, fails to present facts to the court which were available to him prior to the granting of summary judgment against him, and further delays seeking relief for three and one-half years after the filing of the motion for summary judgment and over three years after the ruling thereon, should not expect the court to indulge him further.

■ After careful examination of the proposed affidavits and the certified rec-

ords accompanying them, we conclude that in some respects they do more than merely "clarify" facts already stated, in that they contain additional information which, had it been timely presented, could possibly have raised triable issues of fact. However, in view of the long delay in presenting such facts which were at all times known to appellants, we are unwilling to reverse this judgment to enable appellants to get "another bite of the apple." Appellants had their day in court and obtained a ruling on the issues presented. It would be inappropriate to grant them another opportunity to present additional evidence which was available at the time of the original summary judgment proceeding. If such were permissible, there would be no end to litigation. We hold, therefore, that the trial court did not err in rejecting the affidavits and in denying the motion for new trial.

### CROSS–APPEAL

■ The last issue for consideration is a purported cross-appeal by Overson, who claims the trial court erred in denying him attorney's fees pursuant to A.R.S. § 12–1103. The statute, insofar as material here, is set forth in footnote 3, *supra*. We find no notice of appeal from this order and therefore this court lacks jurisdiction to entertain the issue. However, we note in passing that the statute applies only to situations in which the party requesting the quit claim deed is entitled to it at the time of the request.

### OVERSON'S MOTION TO DISMISS APPEAL

Overson filed with this court a motion to dismiss the appeal on the ground that the Cowleys' opening brief failed to conform to the rules prescribing the contents of briefs. Overson points out that the brief contained, in its appendix, an aerial photograph with markings thereon, which had not been admitted into evidence by the trial court. The Cowleys' response is that the exhibit was offered solely for illustrative purposes to assist the court in understanding the geography and spacial relations involved in the lawsuit, and to simplify an understanding

of the affidavits to be considered on appeal. Furthermore, they point out that it is an identical copy of an exhibit attached to an affidavit which was the subject of their motion to file additional affidavits, rejected by the trial court but in fact filed in the office of the clerk. The Cowleys rely on Rule 11(a)(3), Arizona Rules of Civil Appellate Procedure, which states "[e]ither party may include copies of any of the papers making up the record on appeal as an appendix to any of the briefs", and Rule 11(a)(1) which states that [t]he papers making up the record on appeal . . . shall be the original papers, exhibits and other subjects filed with the clerk of the superior court . . . ."

■ One of the issues in this appeal is whether the trial court abused its discretion in rejecting the proposed additional affidavits which were the subject of the motion to file them. The aerial map was attached to the proposed affidavit of Graham Cowley, in which he swears that it correctly portrays the forty-acre tract as well as the surrounding area. Cowley also states in the affidavit that the external boundaries of "our land" are included in the unbroken pink lines, which border the north and west sides of the subject property, and the east and north fences of the disputed land are indicated in broken pink lines. The basic map purports to be a photocopy of one prepared by the United States Department of Agriculture, Soil Conservation Service. No effort was made by counsel for the Cowleys to mislead the court. Indeed, in their opening brief they fully explain the purpose of the attachment and that it was for illustrative purposes only. Overson has not advised us wherein the map contains any misrepresentation of the geography relevant to the case.

The rules plainly authorize inclusion of the aerial map, which was part of the record on appeal, in the appendix to the brief. Overson's motion to dismiss the appeal is denied.

### THE COWLEYS' REQUEST FOR SANCTIONS

■ The Cowleys have requested the court to impose sanctions, by way of assess-

ment of attorney's fees, asserting the motion to dismiss was frivolous within the meaning of Rule 25, Arizona Rules of Civil Appellate Procedure. Overson's contention, as we understand it, is that inasmuch as the trial court did not grant the Cowleys' motion for leave to file the affidavits and their attachments, they should not have been considered as filed and hence were not part of the record. While such argument may be somewhat sophistic and we have rejected it, we hesitate to brand it as frivolous. The request for sanctions is denied.

To recapitulate, the summary judgment in favor of Overson is affirmed; the trial court's denial of motion to file additional affidavits is affirmed; Overson's motion to dismiss the appeal is denied; and the Cowleys' motion to impose sanctions is denied.

. JACOBSON, P.J., and R. PORTER MURRY, Judge (retired), concur.

NOTE: The Honorable YALE McFATE and The Honorable R. PORTER MURRY, both retired judges of a court of record, were authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Arizona Const. art. VI, § 20.